**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WAYNE RITCHIE,
  *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA;
ROBERT V. LASHBROOK, in his
individual and official capacities;
IRA FELDMAN, in his individual and
official capacities,
  *Defendants-Appellees.*

No. 05-16401

D.C. No.
CV-00-03940-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
May 18, 2006—San Francisco, California

Filed June 26, 2006

Before: Betty B. Fletcher, Alex Kozinski and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Kozinski

## COUNSEL

Sidney Bender, Leventritt Lewittes & Bender, New York, New York, for the plaintiff-appellant.

Owen P. Martikan, Assistant United States Attorney, San Francisco, California, for the defendants-appellees.

## OPINION

KOZINSKI, Circuit Judge:

We consider what inferences a district judge may draw, during a bench trial, in deciding a motion for judgment based on partial findings under Federal Rule of Civil Procedure 52(c).

### Facts

On December 20, 1957, Wayne Ritchie, then a Deputy United States Marshal, attended a lunch-time Christmas party at the United States Post Office Building[1] in San Francisco. Ritchie drank a bourbon and soda, and then returned to his desk. Later that afternoon, with the party now in full swing, Ritchie took a break to down three or four more bourbon and sodas. When he returned to his office, he began to feel paranoid and worthless.

Ritchie left work early and went home. There, an unpleasant conversation with his live-in girlfriend from New York, who complained about living in San Francisco, drove him to leave the apartment in favor of the Vagabond Bar. He drank two more bourbon and sodas; his feelings of restlessness and paranoia continued. After about half an hour, he left the bar

---

[1]Now known as the James R. Browning United States Courthouse.

and began walking back to his office. As he walked, Ritchie hatched a plan to rob a bar so he could buy his unhappy girlfriend a plane ticket home to New York. According to Ritchie, he fully expected to get caught; in his paranoid state, he figured that the robbery would be an act of self-destruction.

Ritchie retrieved two guns from his storage locker at work and set out to put his plan into action. He decided to target the Shady Grove Bar. Once there, Ritchie ordered another bourbon and soda. After finishing his drink, Ritchie went up to the bartender, pulled out a gun and demanded money. A waitress came up behind him and asked Ritchie what he was doing. When Ritchie turned around, someone knocked him unconscious.

Ritchie awoke with two officers standing over him. As a result of his attempted robbery, he resigned from the Marshal's Office, pled guilty to attempted armed robbery, paid a $500 fine and was sentenced to five years probation. Obviously, these were the days before sentencing guidelines.

Fast forward forty-two years. In 1999, Ritchie read the newspaper obituary of Sidney Gottlieb, a doctor at the Central Intelligence Agency. *See* Obituary, *S. Gottlieb, directed mind-control tests*, *San Jose Mercury News*, Mar. 11, 1999, at 7B. From this article, Ritchie learned that the CIA had been administering LSD to unwitting subjects in the 1950s as part of a Cold War project to study its effects.[2] *See generally Kronisch* v. *United States*, 150 F.3d 112, 116-19 (2d Cir. 1998) (describing the CIA's drug-testing project). Based on this article, as well as his own independent research into the CIA's drugging activity, Ritchie concluded that the CIA had drugged him as part of a mind-control experiment. Ritchie brought a timely suit under the Federal Tort Claims Act

---

[2]The government admits that the CIA secretly tested LSD on U.S. citizens during the 1950s and 60s. The government disputes, however, that Ritchie was one of its subjects.

("FTCA"), 28 U.S.C. §§ 2671-2680, against the United States and its agents, claiming that his attempted robbery was set in motion when someone surreptitiously slipped LSD into his drinks at the 1957 Christmas party.

After denying the government's motion to dismiss, *Ritchie* v. *United States*, 210 F. Supp. 2d 1120, 1131 (N.D. Cal. 2002), and for summary judgment, the district court held a four-day bench trial. Ritchie presented two live witnesses during his case-in-chief: himself and a doctor who testified that LSD was the cause of Ritchie's attempted robbery of the Shady Grove. Ritchie also relied heavily on the deposition testimony of Ira "Ike" Feldman, a former agent involved with both the Federal Bureau of Narcotics and the CIA's surreptitious LSD-doping project, who made a series of incriminating,[3] contradictory[4] and combative[5] statements about his role in the CIA's LSD project.

---

[3][Ritchie's attorney:] Now, all these people that you personally drugged, you never did any follow-up on them, in the sense of telling them that you had drugged them, did you?

[Government attorney:] Objection. Lacks foundation. Go ahead and answer it, if you can.

[Feldman:] Not all the people that I drugged. I drugged guys involved in about ten, twelve, period. I didn't do any follow-up, period, because it wasn't a very good thing to go and say "How do you feel today?" You don't give them a tip. You just back away and let them worry, like this nitwit, Ritchie.

[Ritchie's attorney:] When you say "let them worry," you mean let them have a head full of LSD and let—

[Feldman:] Let them have a full head, like what happened, like what happened with this nut when he got out and got drunk.

[4][Ritchie's attorney:] Mr. Feldman, did you ever witness anybody slipping LSD to another person?

[Feldman:] Never did.

[Ritchie's attorney:] Did you ever slip LSD to another person?

[Feldman:] Never did. Never did.

[5][Ritchie's attorney:] And were there ever prostitutes that you gave

At the close of Ritchie's case, the government moved for judgment as a matter of law, which the district court construed as a motion under Federal Rule of Civil Procedure 52(c) for judgment based on partial findings in a bench trial. The district court granted the government's motion, finding that (1) Ritchie had not proven that he was administered LSD by an agent of the federal government, or by anyone else, on December 20, 1957; and (2) Ritchie had therefore failed to prove that an *LSD-induced*[6] psychotic disorder caused his attempted robbery of the Shady Grove. The district court rejected Ritchie's arguments that he was entitled to a favorable evidentiary inference because the government destroyed files related to the CIA's drugging activity and that he should be granted preclusive sanctions based on government misconduct during Feldman's depositions. Instead, the district court awarded Ritchie "reasonable costs and attorneys' fees" incurred in taking Feldman's second deposition.

## Jurisdiction

The government argues that we lack jurisdiction over Ritchie's appeal because the district court has yet to fix the amount of its monetary sanctions award and the judgment below is therefore not final. *See Kennedy* v. *Applause, Inc.*, 90 F.3d 1477, 1483 (9th Cir. 1996); *Jensen Elec. Co.* v. *Moore,*

---

[LSD] to to give to other people?

[Feldman:] I imagine there were. I don't remember what they were doing off times.

[Ritchie's attorney:] Didn't you have a great reputation as having a lot of whores?

[Feldman:] Whores, just like you too. You are a whore master, too. I was working for Uncle Sam. I was doing more than you were doing, Buster.

[6]The parties stipulate that Ritchie "suffered a brief psychotic episode on the night of December 20, 1957." They do not agree as to the cause of that episode.

*Caldwell, Rowland & Dodd, Inc.*, 873 F.2d 1327, 1329 (9th Cir. 1989). But Ritchie has expressly waived his right to monetary sanctions based on the government's misconduct during Feldman's depositions, leaving nothing for the district court to decide. We have jurisdiction. *See* 28 U.S.C. § 1291.

## Discussion

**1.** Ritchie argues that in ruling on a motion for judgment based on partial findings, *see* Fed. R. Civ. P. 52(c), the district court must draw all reasonable inferences in favor of the non-moving party. According to Ritchie, the standard for entering judgment on partial findings during a bench trial under Rule 52(c) is the same as for entering judgment as a matter of law during a jury trial under Federal Rule of Civil Procedure 50(a).

**[1]** Rules 50(a) and 52(c), however, assign very different functions to the district judge. Rule 50(a) provides that once a party has been fully heard on an issue during a *jury* trial, the court may grant a motion for judgment as a matter of law against the non-moving party only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). The rationale is obvious: During a jury trial, the jury—not the judge—is the trier of fact. Because the district judge lacks the authority to resolve disputed issues of fact under those circumstances, judgment as a matter of law is appropriate only if no reasonable jury could find for a party on that claim. This necessarily means that the court must draw all reasonable evidentiary inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." (ellipsis in original) (quoting *United States* v. *Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (internal quotation marks omitted)). When the jury is the trier of fact, judgment as a matter of law is appro-

priate only if no reasonable jury could find in favor of the non-moving party. *See id.*

**[2]** By contrast, a motion for judgment on partial findings under Rule 52(c) may be made only during a bench trial. Under Rule 52(c), "the court may enter judgment as a matter of law . . . with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Fed. R. Civ. P. 52(c). Rule 52(c) expressly authorizes the district judge to resolve disputed issues of fact. *See* Fed. R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous."). In deciding whether to enter judgment on partial findings under Rule 52(c), the district court is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence.[7]

**[3]** Although Ritchie's behavior on December 20, 1957, may have been consistent with an LSD-induced psychotic episode, the district court reasonably found that "there are other plausible explanations for the symptoms that Ritchie described, including mild intoxication or some undiagnosed organic condition." The court concluded that it was "likely[ ] that Ritchie's behavior was caused by some organic factor,

---

[7]The Supreme Court has held with respect to Rule 52(c)'s predecessor that the district court need not give the non-moving party any favorable inferences. *See Lytle* v. *Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990) ("[A]lthough a court might, after reviewing the evidence, decide in favor of the party moving for a dismissal under Rule 41(b) [Rule 52(c)'s predecessor], that court might not take the same case away from the jury because it might believe that the jury could *reasonably* find for the non-moving party."); *see also* Fed. R. Civ. P. 52 advisory committee's note to 1991 amendment.

That the phrase "judgment as a matter of law" appears in both Rule 50(a) and Rule 52(c) may be confusing, but it is not dispositive. As described above, the standard for entering judgment as a matter of law differs under each of these rules.

either alone or in combination with a modest degree of alcohol intoxication. It is also possible that Ritchie's apparent lapse of judgment was exactly what it appears to be." Although the court acknowledged that Ritchie's behavior may well have been consistent with an LSD-induced psychotic episode, the court noted that "[t]o take [this] inference . . . to its logical conclusion" would compel the court "to find that LSD intoxication is the likely cause of almost any unexplained and superficially inexplicable behavior." The district court's finding that Ritchie did not carry his burden of proof is supported by the record.

[4] Although Feldman made a number of comments in his depositions suggesting that he was involved in drugging Ritchie, the district court's determination that Ritchie did not prove Feldman's involvement is not clearly erroneous. Feldman may have been lying to provoke defense counsel, trying to be funny, or simply speaking imprecisely when he made the purported admissions. Richie's lawyer asked no follow-up questions that might have elicited more detail about Feldman's vague assertions. Because Ritchie failed to prove he was drugged by the government (or by anybody else) on December 20, 1957, he has also failed to establish that the alleged drugging caused his misfortunes.[8]

---

[8]This is a troubling case. Ritchie filed suit over four decades after the events in question, and long after memories had grown stale, witnesses had died and potentially relevant files had been destroyed. Despite that, Ritchie has persevered for many years to vindicate his name, and to find some measure of peace with the events of December 20, 1957.

Although we affirm the judgment against Ritchie, we think it is quite possible that everything Ritchie says happened did happen—that Ritchie was drugged by his own government, and suffered great personal and financial hardships as a result. But, although it is *possible* that Ritchie was drugged, the district court's finding that he has not proved it is not clearly erroneous. Yet we know some people were drugged; the government admits as much. Ritchie's allegations of Cold War drugging by the CIA may thus be true, even though he could not prove them to the satisfaction of the district court. If Ritchie's claims are indeed true, he has paid a terrible price in the name of national security.

**[5] 2.**    Ritchie claims that the district court erred in refusing to draw an adverse inference against the government from the fact that the CIA destroyed documents relating to its LSD experiments on unwitting victims. Parties should not be able to escape liability by destroying evidence of their own wrongdoing. The intentional destruction of evidence relevant to an issue at trial can therefore support an inference that the evidence would have been unfavorable to the party that destroyed the evidence. 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 291 (James H. Chadbourn rev. 1979).[9]

**[6]** This common law rule generally requires that the party seeking the adverse inference make a showing of relevance specific to the destroyed documents: The party must show that the document in question directly pertained to the disputed issue and could have supported its view of the facts. *See id.* at 228 (requiring "some evidence tending to show that *the document actually destroyed* or withheld is *the one* as to whose contents it is desired to draw an inference" (emphasis altered)). This standard makes sense when one party alleges that the other has caused a specific document to disappear, such as a contract or a deed. In this context, the parties to a dispute are usually both aware of the relevant paperwork, and can testify as to its contents. *Kronisch*, 150 F.3d at 128.

**[7]** The situation is different where one party destroys documents containing information gathered from unwitting subjects; in such circumstances, the subjects have no information as to the exact content of the destroyed documents. The destruction thus prevents the victims from obtaining the proof they need to support the adverse inference. Application of the strict common law requirements in such circumstances would

---

[9]The party requesting the inference must also show that the destroying party had an obligation not to destroy the evidence. The district court assumed without deciding that the government had such a duty here for the reasons articulated in *Kronisch*, 150 F.3d at 127, and the issue is not contested on appeal.

frustrate the adverse-inference rule and enable a party engaged in underhanded behavior to escape liability by regularly destroying documents.

**[8]** The Second Circuit confronted this conundrum in *Kronisch* and held that triers of fact must carefully consider whether the document destruction has made it more difficult for a party to prove that the documents destroyed were relevant. *Kronisch*, 150 F.3d at 128. If this is found to be the case, the burden on the party seeking the adverse inference is lower; the trier of fact may draw such an inference based even on a very slight showing that the documents are relevant. *Id.* We have cited *Kronisch* with approval, *see Med. Lab. Mgmt. Consultants* v. *Am. Broad. Cos.*, 306 F.3d 806, 825 (9th Cir. 2002), and to the extent we have not previously done so, we adopt the Second Circuit's careful and balanced approach for dealing with this difficult problem.[10]

**[9]** Ritchie's proof at trial would have been sufficient to permit the district court to draw an adverse inference under the *Kronisch* standard, had it chosen to do so.[11] *See* 150 F.3d

---

[10]In *Kronisch*, the issue was presented in a somewhat different procedural posture, as it came up during review of a summary judgment motion. 150 F.3d at 116. The court considered whether the plaintiff had presented proof that would be sufficient, if presented at trial, to support a jury inference that the destroyed documents could have supported plaintiff's case. *Id.* at 126. While our case arises much later in the proceedings, the inquiry is the same: Was the evidence sufficient to permit a trier of fact to draw an adverse inference against the defendant?

[11]The proof in both cases was highly tenuous. The victim in *Kronisch* had been served a drink in a Paris bar by a man with a club foot. Gottlieb, the head of the CIA's LSD project had a club foot and *could* have been in Paris at the time. 150 F.3d at 129 & n.12. Even though the government denied that it had conducted LSD experiments in Paris, or any experiments at all on U.S. citizens abroad, the Second Circuit nevertheless concluded that the plaintiff's evidence was sufficient to allow a trier of fact to draw an adverse inference against the government. *Id.* In our case, it is undisputed that LSD experiments on U.S. citizens were conducted in San Francisco. Ritchie's evidence linking the CIA with the events of December 20, 1957, was a diary entry on that date by George White, Feldman's superior, reading: "home flu—xmas party Fed bldg Press Room."

at 129. That is very different, however, from saying that the district court was *required* to draw an adverse inference against the government as to what the missing documents would have proven. The district judge here considered both the lack of direct evidence linking Ritchie's drugging with the destroyed documents and "the manifest weakness of the circumstantial evidence that Ritchie presented at trial." After evaluating the evidence Ritchie presented, the district judge determined that Ritchie was not entitled to a favorable evidentiary inference on the issue of liability. We cannot say that the district court was irrational in so concluding. *See Kronisch*, 150 F.3d at 129 (noting that despite surviving summary judgment, circumstantial evidence regarding proof of the documents "may prove to be altogether vulnerable at trial").

[10] **3.**   Ritchie argues that the district court should have entered judgment against the United States on the question of liability as a sanction for various discovery abuses. Ritchie's first claim is based on what he argues was the government's presentation of, and reliance on, what it knew was perjured testimony (that of Feldman). The district court, however, found that Ritchie had not carried his burden of showing that the lawyer representing the government had knowingly presented perjured testimony. Feldman had been quoted in two published sources making statements that were inconsistent with some of his deposition testimony. But the district court reasonably concluded that the government was not required to accept those earlier statements as true; rather, it was entitled to proceed on the assumption that Feldman had testified truthfully at his deposition. The district court's finding that Ritchie failed to prove by clear and convincing evidence that the government acted in bad faith in relying on Feldman's deposition testimony is supported by the record. *Phoceene Sous-Marine* v. *U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 n.13 (9th Cir. 1982) (noting that bad faith must be proven by clear and convincing evidence). Because no violation was found, the district court's decision not to impose sanctions was obviously not an abuse of discretion.

The district court did find that the lawyer representing the government had acted in an "obdurate" and "obstreperous" fashion during Ritchie's deposition, and this may well have interfered with Ritchie's ability to elicit helpful testimony from Feldman. While terming the government lawyer's conduct "unprofessional," the district court refused to sanction the United States by entering judgment against it on liability, finding such sanctions to be " 'grossly out of proportion' to the harm" Ritchie had suffered from the lawyer's conduct. Instead, the district court selected a remedy that it considered "more closely proportionate to the gravity" of the government's misconduct, namely, the payment of Ritchie's reasonable costs and expenses for taking Feldman's second deposition.

In reaching this conclusion, the court noted that Ritchie would not, ultimately, be prejudiced by the government's misconduct because "at trial, plaintiff's counsel will have the opportunity to ask the follow-up questions that Feldman managed to evade as a consequence of [the government's] misconduct." And, indeed, Feldman was originally listed as a witness on the parties' Joint Pre-Trial Statement. Subsequently, however, the statement was amended, and Feldman was removed from the live witness list and was listed, instead, as testifying by way of deposition. There is no explanation in the record for this change, and certainly no objection from plaintiff.[12] Nor did plaintiff request that the district court extend the discovery period and allow him to depose Feldman, yet again.

---

[12]In his reply brief before us, Ritchie suggest that he could not subpoena Feldman for trial, because he lived more than 100 miles away from the courthouse. *See* Fed. R. Civ. Pro. 45(b)(2). But this matter was not raised with the district court. Nor did Ritchie file a motion for reconsideration of the district court's discovery order, on grounds that the remedy the district court envisioned—questioning Feldman at trial—was not viable in light of plaintiff's inability to subpoena Feldman. Not having been raised below, at a time when the district court might have been able to deal with the problem, this argument is waived.

**[11]** District Courts have broad discretion in imposing discovery sanctions. *See Anheuser-Busch, Inc.* v. *Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). Moreover, preclusive sanctions, such as dismissal of a case or entry of judgment against a party, are disfavored. *See United States ex rel. Lujan* v. *Hughes Aircraft Co.*, 67 F.3d 242, 247-48 (9th Cir. 1995). When the district court chooses *not* to impose preclusive sanctions, and gives sound reasons for its actions—as the court did here—we must conclude that the court did not abuse its discretion.

**4.** Because we affirm on other grounds, we need not reach the government's alternative argument that the Federal Employees' Compensation Act, 5 U.S.C. §§ 8101-8193, bars Ritchie's claims under the FTCA.

**AFFIRMED.**