DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JULIE ADAMSON,** individually and as personal representative of the
**ESTATE OF JACKLYN ADAMSON,**
Appellant,

v.

**R.J. REYNOLDS TOBACCO COMPANY,**
Appellee.

No. 4D19-3242

[July 21, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County; Meenu Sasser and Cymonie Rowe, Judges; L.T. Case No. 502016CA008532.

Celene H. Humphries and Thomas J. Seider of Brannock Humphries & Berman, Tampa, Gregory D. Prysock, Katherine M. Massa, and Antonio Luciano of Morgan & Morgan, Jacksonville, Keith R. Mitnik, of Morgan & Morgan, Orlando, and James D. Clark of Morgan & Morgan, Tampa, for appellant.

Val Leppert and Chad A. Peterson of King & Spalding, Atlanta, GA, for appellee.

GROSS, J.

In this *Engle* progeny wrongful death action, the plaintiff, Julie Adamson, as personal representative of the Estate of Jacklyn Adamson, appeals a final judgment in favor of R.J. Reynolds Tobacco Company ("RJR") entered after a jury returned a defense verdict. We affirm, holding that the trial judge did not abuse her discretion by including Florida Standard Civil Jury Instruction 301.11(a) in the charge to the jury.

### *Background*

The decedent, Jacklyn Adamson, smoked 50 cigarettes a day. In May 1992, at the age of 40, she was diagnosed with a lung mass. She died of cancer in August 1993, leaving behind her husband, John Adamson, and their 10-year-old daughter, Julie.

One of the disputed issues in this case was whether the decedent had primary lung cancer (i.e., cancer that had originated in her lung and metastasized elsewhere) or secondary lung cancer (i.e., cancer that had originated elsewhere but metastasized to the lung).

### *The Medical Evidence and the Limited Medical Records*

The only medical records available were 42 or 43 pages generated from the decedent's three-day stay in March 1993 at Rhode Island Hospital, where she underwent gamma knife surgery to treat a metastatic brain tumor. The operative report stated: "This is a woman who presents with a lung mass in May of 1992. Biopsy revealed adenocarcinoma." The operative report also stated that the diagnosis was "left occipital brain metastasis from lung."

The Plaintiff's expert pulmonologist agreed that the parties did not have all of the decedent's medical records, that there were no medical records of the decedent's initial workup and diagnosis, and that there were no medical records from the last six months of the decedent's life. He acknowledged that "a lot of the records that would have existed for Mrs. Adamson no longer exist." He explained that this was not uncommon, because most hospitals "now only keep records for two years."

Still, the Plaintiff's expert opined that there were sufficient medical records to establish a diagnosis because the mass was found in the lung, the mass was biopsied in the lung, the biopsy showed "a lung cancer type of lesion," and the decedent was treated with a chemotherapy "specifically designed to treat lung cancer." He testified that the decedent's death was caused by "complications from her metastatic adenocarcinoma of the lung."

The Plaintiff's expert acknowledged, however, that lung cancer is most frequently diagnosed in people aged 65 to 75 years old.

The Defendant's first expert forensic pathologist testified that most of the medical records he would normally review were not available. He agreed that the decedent's treating doctors concluded that she had "lung primary adenocarcinoma." However, he could not, as an independent evaluator, "actually confirm or refute that with such little medical record." He also testified that it was "very, very unusual" to get lung cancer at age 40. Breast cancer "would be much more common," though he acknowledged that there was no mention of breast cancer in anything he reviewed about the case.

2

A second defense expert pathologist testified that "very few" pages of medical records were available for his review. He explained that the number of medical records that would have been created for the decedent between May 1992 and August 1993 "could be thousands."

He opined that "the records are insufficient to support a definitive diagnosis of the primary site" and that the decedent's cancer was "best classified as a cancer of unknown origin." He explained that "we don't have records to know what the diagnoses were, how it was worked up, and we don't know the details of the case that we need to know in order to be definitive about diagnoses or – of type." When asked what he thought was "the most likely if it's not a cancer of unknown origin," he testified that he would include breast cancer, gynecologic cancer, colorectal cancer, thyroid cancer, and "then I would include lung cancer, as primary sites of tumor, potentially."

The jury submitted a question to the second defense expert pathologist: "Back in 1992, 1993, would copies be made of medical records and treatment? Would these copies of records and treatments be given to Mrs. Adamson?" The doctor answered: "If requested back then, she could have had copies of the medical records and the treatments . . . I can't say for all hospitals, but for most hospitals, it was viewed as part of the record, and the patient can have it if they want."

### The Engle *Decision and the Instant Lawsuit*

In July 2006, the Florida Supreme Court issued its original opinion in *Engle v. Liggett Group, Inc.*, No. SC03-1856, 2006 WL 1843363 (Fla. 2006), *withdrawn and substituted on rehearing by* 945 So. 2d 1246 (Fla. 2006), which decertified the *Engle* class but authorized class members to file individual claims within one year of the mandate.

Lung cancer is a qualifying disease for *Engle* class membership, but some of the cancers that could not be definitively ruled out in this case, such as breast cancer and colon cancer, are not qualifying diseases. *Engle*, 945 So. 2d at 1276–77.

In September 2006, Mr. Adamson contacted the law firm of Morgan & Morgan regarding a potential lawsuit against the tobacco companies for the death of his wife.

One year later, in September 2007, Mr. Adamson filed this *Engle* progeny wrongful death lawsuit.

### *Mr. Adamson's Destruction of Medical Records*

In an April 2008 call log, a paralegal at Morgan & Morgan memorialized a phone call with Mr. Adamson in which the firm was "trying to fill in the blanks on his discovery." The paralegal asked Mr. Adamson "if he happened to have any medical records," and Mr. Adamson replied that "he shreaded [sic] them all about 2 years ago because they were so old and he didn't think he would ever need them."

### *The Substitution of the Plaintiff upon Mr. Adamson's Death*

Mr. Adamson died in 2014 and his daughter was substituted as the Plaintiff and personal representative of the decedent's estate.

### *Production of the Call Log*

In 2017, the Plaintiff served RJR with Mr. Adamson's handwritten answers to interrogatories that he filled out in 2008 before his death.

RJR served a request for production of all documents and correspondence relating to Mr. Adamson's draft responses. In response, the Plaintiff voluntarily produced the April 2008 call log about the shredded medical records.

### *Motion for Adverse Inference Instruction*

RJR filed a motion for an adverse inference jury instruction based on Mr. Adamson's "intentional destruction of essential medical evidence." Specifically, RJR asked the trial court to instruct the jury with Standard Civil Jury Instruction 301.11(a). This instruction permits—but does not require—the jury to draw an adverse inference if the jury concludes that a party lost or destroyed evidence that "would have been material in deciding the disputed issues in this case." Fla. Std. Jury Instr. (Civ.) 301.11(a).

The Plaintiff opposed RJR's request for an adverse inference instruction, arguing that: (1) there was no evidence that critical documents were discarded; (2) there was no duty to preserve evidence; and (3) the dearth of medical records did not prevent RJR from presenting its defense.

### *First Hearing on the Instruction and Written Order*

The first circuit judge assigned to the case, Judge Meenu Sasser, held a hearing on RJR's motion for the adverse inference instruction.[1]

Judge Sasser entered a thoughtful, detailed order granting RJR's request for an adverse inference instruction. She reasoned that the standard adverse inference instruction was appropriate because "there is evidence that Mr. Adamson once possessed his wife's medical records and that he shredded 'them all' in about 2006," and because "the testimony from both sides' medical experts would allow the jury to find that the missing records would have been material in resolving the disputed issues in this case."

Judge Sasser rejected the Plaintiff's arguments against giving the instruction. She reasoned that, in contrast to more drastic remedies such as dismissal of the suit or a burden-shifting presumption, a duty to preserve evidence "is not required for an adverse inference to arise." Alternatively, even if a duty to preserve were required for an adverse inference instruction, she found that "when Mr. Adamson shredded his wife's medical records 'about 2 years' before April 2008, it was reasonably foreseeable that litigation against the tobacco companies could ensue."

Judge Sasser emphasized that: (1) as far back as 1997, the *Engle* class notice was widely circulated in the Florida media, including the *Palm Beach Post*, a publication to which Mr. Adamson subscribed; and (2) there was "also evidence that Mr. Adamson was actually contemplating this lawsuit in 2006," as "his daughter testified that he expressed his intent to do so around that time, and Morgan & Morgan's records indicate that he in fact contacted the firm about such a lawsuit in 2006." She concluded that "litigation was reasonably foreseeable when Mr. Adamson destroyed the medical records and thus a duty to preserve did in fact exist at that time—or at least Defendant's proffer is sufficient to allow the jury to find that litigation was reasonably foreseeable."

Judge Sasser rejected as "circular" the Plaintiff's argument that the court should not give the adverse inference instruction because it was not clear what the destroyed medical records would have revealed. She explained: "The problem with destroyed evidence, of course, is that it is

---

[1] The Plaintiff waived any evidentiary objection to the call log in exchange for RJR's agreement not to pursue additional discovery—in particular, not to take a deposition of the records custodian of Morgan & Morgan under Florida Rule of Civil Procedure 1.310(b)(6).

unavailable.  And the point of an adverse inference instruction is to inform the jury that it may (but need not) resolve the uncertainty that has resulted from the loss of the evidence against the party that lost it."

Judge Sasser further ruled that a jury could find from the evidence "that Mr. Adamson possessed and destroyed records that would have been material to the resolution of a disputed issue."  She pointed out that "the medical experts will testify about the typical course of a cancer diagnosis and subsequent treatment and the type of records that should be available," and then "will also explain that (1) only 'minimal' records are available, (2) a substantial volume of important records are missing, and (3) the missing records would have been helpful in addressing the disputed, threshold question of where Mrs. Jacklyn Adamson's cancer originated."  Moreover, she noted, "Mr. Adamson revealed his destruction of these records in response to questioning from his counsel looking for records relevant to this case."

Finally, Judge Sasser's order emphasized the permissive nature of the instruction: "Of course, Plaintiff is free to convince the jury otherwise.  She can tell the jury that it should conclude that Mr. Adamson did not destroy material evidence and that it therefore should not draw an inference against Plaintiff."

### The First Trial

During the jury's deliberations in the first trial, the trial court declared a mistrial for reasons unrelated to the adverse inference instruction.

### The Second Trial

Following the first trial, the case was transferred to Judge Rowe.  The Plaintiff moved for Judge Rowe to reconsider Judge Sasser's order granting RJR's request for the adverse inference instruction.  Judge Rowe denied the motion and later stated that she "specifically reaffirmed" Judge Sasser's ruling.

Consistent with the standard jury instruction, the trial judge instructed the jury:

> If you find that John Adamson destroyed or otherwise caused any of Jacklyn Adamson's medical records to be unavailable, while they were within his possession custody or control, and these medical records would have been material in deciding the disputed issues in this case, then you may, but are not

6

required to, infer that the records would have been unfavorable to plaintiff. You may consider this, together with the other evidence, in determining the issue of this . . . case.

The jury returned a defense verdict, and the trial court entered a final judgment in favor of RJR.

### *Standard of Review*

A trial court's decision whether to give a jury instruction is reviewed for an abuse of discretion. *Barton Protective Servs., Inc. v. Faber*, 745 So. 2d 968, 974 (Fla. 4th DCA 1999).

"Generally, the applicable standard jury instructions are presumed correct and should be given unless such instructions are erroneous or inadequate." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 516 (Fla. 2015). Moreover, a party is entitled to have the jury instructed upon its theory of the case "when there is evidence to support the theory." *Seaboard Coastline R.R. Co. v. Addison*, 502 So. 2d 1241, 1242 (Fla. 1987). Stated another way, an instruction on a party's theory of the case is warranted when the evidence, viewed in a light favorable to that party, "substantially supports the theory even though that theory is controverted." *Florio v. Eng*, 879 So. 2d 678, 679 (Fla. 4th DCA 2004).

On appeal, the party defending against an attack on a jury instruction "must show that the requested instruction accurately stated the applicable law, the facts supported giving the instruction, and the instruction was necessary in order to allow the jury to properly resolve all the issues in the case." *Stokes v. Wynn*, 219 So. 3d 891, 894 (Fla. 4th DCA 2017).

### *Law on Spoliation*

First-party spoliation occurs when a party to the action "lost, misplaced, or destroyed" evidence. *Martino v. Wal-Mart Stores, Inc.*, 908 So. 2d 342, 345 n.2 (Fla. 2005). When a party has intentionally interfered with the adverse party's access to critical evidence, "a wide range of sanctions is available to the trial court under Florida Rule of Civil Procedure 1.380(b)(2)." *Pub. Health Tr. of Dade Cnty. v. Valcin*, 507 So. 2d 596, 599 (Fla. 1987). However, when essential evidence is unavailable due to a party's negligence, a rebuttable presumption arises in favor of the other party. *Id.*

"Prior to a court exercising any leveling mechanism due to spoliation of evidence, the court must answer three threshold questions: 1) whether the

evidence existed at one time, 2) whether the spoliator had a duty to preserve the evidence, and 3) whether the evidence was critical to an opposing party being able to prove its prima facie case or a defense." *Golden Yachts, Inc. v. Hall*, 920 So. 2d 777, 781 (Fla. 4th DCA 2006).

The first threshold question for the court before imposing a spoliation remedy is whether the evidence existed at one time. *See, e.g., Lopez Barrios v. State*, 315 So. 3d 720, 723 (Fla. 4th DCA 2021).

For example, in *Jordan ex rel. Shealey v. Masters*, 821 So. 2d 342 (Fla. 4th DCA 2002), we held that an adverse inference instruction was improper where the trial court failed to make a preliminary determination as to whether the allegedly missing evidence ever existed and, if so, whether the missing evidence hindered the plaintiff's ability to proceed.

The second threshold question for the court is whether the spoliator had a duty to preserve the evidence. A duty to preserve evidence exists in "circumstances when a party should reasonably foresee litigation." *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 391 (Fla. 2015). Significantly, the Florida Supreme Court stated that "[e]ven in the absence of a legal duty, though, the spoliation of evidence results in an adverse *inference* against the party that discarded or destroyed the evidence." *Id.* (emphasis supplied).

Under *Detzner* and *Golden Yachts*, an adverse inference may arise even in the absence of a duty to preserve evidence. "Unlike an adverse presumption instruction, where the court must find the spoliator was duty-bound to preserve the evidence, an adverse inference may arise in any situation where potentially self-damaging evidence is in the possession of a party and that party either loses or destroys the evidence." *Golden Yachts*, 920 So. 2d at 781 (internal quotation marks omitted).

Florida Standard Civil Jury Instruction 301.11(a), adopted in 2016, is the standard adverse inference instruction. This instruction informs the jurors that they may, but are not required to, infer that missing evidence would be unfavorable to a party if the jury finds the following: (1) a party; (2) lost, destroyed, or otherwise made unavailable evidence while it was within that party's possession, custody, or control; and (3) the evidence would have been material in deciding the disputed issues in this case. Fla. Std. Jury Instr. (Civ.) 301.11(a). Instruction 301.11(a) is consistent with the notion that an adverse inference may arise even in the absence of a duty on the part of the spoliating party to preserve the missing evidence.

The adverse inference contained in Instruction 301.11(a) is permissive in nature and "does not rise to the level of a presumption." Fla. Std. Jury Instr. (Civ.) 301.11(a), Notes on Use at n.2. By contrast, instruction 301.11(b) creates a burden-shifting presumption, but it requires the court to first determine that the spoliating party had a duty to preserve the evidence. Fla. Std. Jury Instr. (Civ.) 301.11(b).

The third threshold question is whether the missing evidence was material to the other party's claim or defense. "The task is unavoidably imperfect, inasmuch as, in the absence of the destroyed evidence, we can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed." *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998).

Still, before a court will permit an adverse inference to be drawn, there must be "some showing indicating that the destroyed evidence would have been relevant to the contested issue." *Id.*; *see also Warren v. City of N.Y. Dep't of Corr. Med. Staff*, No. 17-CV-1125 (PKC) (LB), 2021 WL 1163105, at *15 (E.D.N.Y. Mar. 26, 2021) (explaining that the plaintiff was required to "adduce some evidence from which it could reasonably be inferred that the logbooks will be favorable to him"); *Galicia v. Nat'l R.R. Passenger Corp.*, No. CV 17-8020-JFW (JCx), 2018 WL 6314191, at *4 (C.D. Cal. July 20, 2018) (holding that the plaintiff failed to prove spoliation where she provided no evidence that the automatically-deleted video would have captured the incident); *Putscher v. Smith's Food & Drug Ctrs., Inc.*, No. 2:13-CV-1509-GMN-VCF, 2014 WL 2835315, at *9 (D. Nev. June 20, 2014) (finding an insufficient basis to impose spoliation sanctions where the lost footage would not have included the location of the plaintiff's fall, and the court could "only surmise" that the footage contained relevant evidence; the movant "must at a minimum point to some facts indicating that relevant evidence existed"); *Hiser v. Grand Ledge Pub. Schs.*, 816 F. Supp. 2d 496, 508 (W.D. Mich. 2011) (explaining that the plaintiff "failed to present any credible proof, beyond mere conjecture, that any destroyed document or deleted email would have been relevant to her claims").

"When evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). "By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions." *Id.*

The trial court should determine "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127. Where "a party

loses the opportunity to identify such a particular document or documents likely to contain critical evidence," the prejudiced party "may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Id.* at 128. Courts should take care "not to require too specific a level of proof," because "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference . . . ." *Id.*

### *This Case*

Here, the trial court did not abuse its discretion in giving Instruction 301.11(a). As Judge Sasser concluded in her detailed written order, the proffered facts "easily warrant" the standard adverse inference instruction. Entitlement to this instruction requires a factual proffer of three things: (1) a party; (2) destroyed or lost evidence within his possession or control; and (3) the evidence would have been material in deciding a disputed issue in the case.

In this case, the jury reasonably could have found each of these elements because: (1) Mr. Adamson originally brought this lawsuit as the personal representative of his wife's estate; (2) the call log showed that Mr. Adamson, when asked if he had "any medical records" regarding his wife, admitted that he shredded "them all"; and (3) the testimony from both sides' medical experts regarding the dearth of medical records would have allowed the jury to find that the missing records would have been material in resolving the disputed issues in the case.

The Plaintiff's arguments against giving the instruction are unpersuasive.

#### *A. Fact of Spoliation*

First, the Plaintiff argues that the fact of spoliation was never established, because "[n]o one knows what medical paperwork Mr. Adamson might have had." According to the Plaintiff, the call log's "bare reference to unidentified 'medical records' is insufficient to establish that spoliated evidence existed in John Adamson's possession." The Plaintiff further contends that RJR's request for spoliation sanctions was based on "unfounded speculation."

Contrary to the Plaintiff's argument that the fact of spoliation was never established, RJR made a sufficient evidentiary showing to permit the jury

to conclude that the destroyed evidence was material.  To be sure, it is impossible to know exactly what Mr. Adamson destroyed.  But what is known is that the paralegal asked Mr. Adamson whether he had "any medical records" for his wife, and Mr. Adamson admitted that he shredded "them all."

The ordinary meaning of the term "medical record" is "a record of a patient's medical information (as medical history, care or treatments received, test results, diagnoses, and medications taken)."[2]  Thus, a jury could reasonably infer from the call log that Mr. Adamson destroyed documents that pertained to his wife's diagnosis, treatment, test results, or medications.  And the jury could also infer that the documents in his possession would have been material, meaning that a reasonable person would have attached importance to them in deciding the disputed issues in the case, including the issue of whether Mrs. Adamson had primary lung cancer.  After all, when a law firm asks a client for "medical records" in support of a lawsuit, the firm is clearly asking about documents that would be material to the case.

As Judge Sasser reasoned, the problem with destroyed evidence is that it is unavailable and thus unknowable.  Exactly what medical records Mr. Adamson destroyed is unknown because he shredded them.  The purpose of Instruction 301.11(a) is to tell the jury that it may, but is not required to, resolve the resulting uncertainty against the party who destroyed the evidence.  The materiality of the destroyed records is a jury question under Instruction 301.11(a).  RJR's proffer was sufficient to allow the jury to decide whether Mr. Adamson destroyed material evidence.

While the Plaintiff relies upon three cases stating that adverse inference instructions invade the province of the jury, those cases are inapposite because: (1) they predated the Florida Supreme Court's decision in *Detzner*; (2) the language in at least one of those cases was dicta; and (3) the adverse inference instructions given in the other two cases were worded differently from the current standard instruction.  *See Martino v. Wal-Mart Stores, Inc.*, 835 So. 2d 1251, 1257 n.2 (Fla. 4th DCA 2003) (stating in dicta: "We note, however, that while counsel is free to make arguments concerning the adverse inference created by Wal–Mart's failure to produce the shopping cart and videotape, a jury instruction on this

---

[2]    *Medical    Record,*    Merriam-Webster    Online    Dictionary, https://www.merriamwebster.com/dictionary/ medical/medical%20record (last visited June 30, 2021)

11

matter is not appropriate.")[3]; *Jordan*, 821 So. 2d at 346–48 (stating that "[f]or the court to tell a jury that an adverse *inference* may be drawn from the failure to produce evidence invades the province of the jury," but concluding that the adverse inference instruction was improper on multiple grounds, including that the instruction at issue constituted a comment on the evidence); *Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co.*, 881 So. 2d 565, 580 (Fla. 3d DCA 2004) (holding that an adverse inference instruction "invaded the province of the jury" where the trial court specifically instructed the jury that the defendant had destroyed the results of certain tests).

In a case decided after *Jordan* and *Martino*, we clarified that an adverse inference instruction would be appropriate under the right circumstances. *Am. Hosp. Mgmt. Co. of Minn. v. Hettiger*, 904 So. 2d 547, 550 (Fla. 4th DCA 2005). We wrote: "We do not think it is per se error to give a jury instruction as to an adverse inference." *Id.*

In *Hettiger*, although we held that the trial court erred by instructing the jury on a rebuttable presumption of negligence, we left open the possibility that it may be proper at any trial on remand for the trial court to give an adverse inference instruction due to the defendant's destruction of a ladder. *Id.* at 547–51. We explained: "In circumstances where the lost evidence was under the sole control of the party against whom the evidence might have been used to effect, and where the lost evidence is in fact critical to prove the other party's claim, an adverse inference instruction may be necessary to achieve justice in the jury's determination of the case." *Id.* at 550–51. We went on to provide the trial court with a sample adverse inference instruction that is similar to the current standard instruction. *Id.* at 551.

Rather than invading the province of the jury, Instruction 301.11(a) is carefully worded to avoid instructing the jury as to the facts of the case. The instruction allows the jury to decide both the underlying facts (whether a party destroyed material evidence in his possession) and the conclusion to be drawn from those facts (whether it makes sense under all the circumstances to infer that missing evidence was unfavorable to the party who destroyed it).

---

[3] This statement is dicta because the propriety of an adverse inference instruction was not an issue on appeal in *Martino*. The trial court in *Martino* had refused to give an adverse inference instruction, and the appellants did not challenge that ruling on appeal. *Id.* at 1256.

The Plaintiff makes a good argument as to why it is unlikely that Mr. Adamson would have obtained the complete, detailed medical records of his wife when she was being treated for cancer in the pre-HIPPA era of the early 1990s. But this is an argument that should have been presented to the jury, not an argument that warrants reversal of the trial court's decision to give the adverse inference instruction. The whole point of Instruction 301.11(a) is that the jury should consider all the circumstances and may, but is not required to, infer that the missing records would be unfavorable to the party who destroyed them.

In sum, Instruction 301.11(a) was a correct statement of the law, and RJR's proffer laid a sufficient factual predicate to allow the jury to infer the fact of spoliation, warranting the instruction.

*B. Whether a Duty to Preserve is Required*

Second, the Plaintiff argues that the instruction should not have been given because Mr. Adamson did not have a duty to preserve the medical records.

However, the Florida Supreme Court's decision in *Detzner* makes clear that a duty to preserve evidence is not required for the adverse inference instruction to apply. While *Detzner* did not involve jury instructions, it nonetheless explained that an adverse inference may arise even in the absence of a legal duty to preserve evidence.

The Plaintiff cites various cases for the proposition that "an alleged spoliator cannot be sanctioned unless the spoliator violated a duty to preserve the evidence." However, these cases either (1) predate *Detzner*, (2) do not acknowledge *Detzner*, (3) are factually distinguishable from this case, or (4) are otherwise inapposite.

For example, the Plaintiff's reliance upon *Golden Yachts* is misplaced. To be sure, *Golden Yachts* held that an adverse inference instruction was warranted where the trial court answered the three threshold questions—including the duty to preserve—in the affirmative. 920 So. 2d at 780–81. But *Golden Yachts* also states that, unlike a presumption, an adverse inference is not limited to situations where the spoliator is duty-bound to preserve the evidence. *Id.* at 781.

The Plaintiff's reliance upon the Third District's decision in *Pena v. Bi-Lo Holdings, LLC,* 304 So. 3d 1254 (Fla. 3d DCA 2020), is also misplaced. The opinion states that "[t]he essential reason for a spoliation claim is its

deterrent effect" and that "[t]his purpose is served only when an actual duty owed" has been willfully disregarded. *Id.* at 1257. Significantly, however, the case did not cite *Detzner* and was not decided on the duty element but rather on the ground that the evidentiary value of a missing bag of rice was speculative where it was readily described by all witnesses.

A third case cited by Plaintiff is inapplicable because it did not involve the destruction of material evidence. *See Araujo v. Winn-Dixie Stores, Inc.*, 290 So. 3d 936, 940 (Fla. 3d DCA 2019). In *Araujo*, the court found "no legal necessity for giving either jury instruction 301.11(a) or (b) because there was no showing in the record that Winn-Dixie had a duty, statutory or otherwise, to maintain the video for one-hour prior- and one-hour post-incident." *Id.* Significantly, however, the court observed that the plaintiff "suffered no significant impairment in her ability to prove her underlying lawsuit" where Winn-Dixie did produce surveillance video "that started twenty minutes prior to the incident and ended twenty minutes after the incident." *Id.*

The other cases cited by the Plaintiff are similarly unhelpful. *See Bechtel Corp. v. Batchelor*, 250 So. 3d 187, 194–95 (Fla. 3d DCA 2018) (concluding that adverse inference instruction was not warranted for defendant's failure to produce persons employed at power plant over 30 years earlier; the case does not address whether a duty to preserve evidence is required before Instruction 301.11(a) may be given); *Osmulski v. Oldsmar Fine Wine, Inc.*, 93 So. 3d 389, 391 (Fla. 2d DCA 2012) (holding, in a case predating *Detzner* and Instruction 301.11(a), that no spoliation of evidence occurred where the defendant did not have a duty to preserve its video surveillance, and thus no adverse inference or adverse presumption instruction was warranted).

In sum, a duty to preserve evidence is not required for the adverse inference instruction to apply.

*C. The Plaintiff Waived any Evidentiary Objection to the Call Log*

Finally, the Plaintiff waived any objection to the call log based on hearsay or the attorney-client privilege. The Plaintiff's representation that she "lost" her evidentiary objections to the call log is inaccurate.

Therefore, this case does not fall within the rule of *Sheffield v. Superior Insurance Co.*, 800 So. 2d 197, 202 (Fla. 2001), which states: "The concept of 'invited error' does not apply where, as here, the trial court makes an unequivocal ruling admitting evidence over the movant's motion in limine,

14

and the movant subsequently introduces the evidence in an attempt to minimize the prejudicial impact of the evidence."

Here, the Plaintiff herself admitted the call log into evidence at the second trial after having abandoned any objection to its admissibility at the first trial. The Plaintiff made the strategic decision at the first trial to withdraw her evidentiary objection to the call log in exchange for RJR's agreement not to take a records custodian deposition of her counsel's law firm. Although the Plaintiff asked Judge Rowe before the second trial to reconsider Judge Sasser's order granting the adverse inference instruction, the Plaintiff did not withdraw her agreement about the admissibility of the call log. And the Plaintiff never subsequently renewed any evidentiary objection to the call log during the second trial.

Having obtained the benefit of her agreement with RJR and having placed the call log into evidence herself, the Plaintiff cannot be heard to complain about its admissibility. *See, e.g.*, *Fuller v. Palm Auto Plaza, Inc.*, 683 So. 2d 654, 655 (Fla. 4th DCA 1996) ("A party cannot claim as error on appeal that which he invited or introduced below.").

To the extent that the Plaintiff suggests that there was an insufficient evidentiary basis for an adverse inference instruction because the call log was "double hearsay," this argument is without merit. For one thing, hearsay received without objection "becomes part of the evidence in the case and is usable as proof just as any other evidence, limited only by its rational, persuasive power." *Tallahassee Furniture Co. v. Harrison*, 583 So. 2d 744, 754 (Fla. 1st DCA 1991). In any event, had RJR been permitted to depose the records custodian of Morgan & Morgan, RJR likely would have been able to fit both layers of hearsay within a recognized exception— the paralegal's call log likely would have been admissible as a business record, and Mr. Adamson's statement within the call log likely would have been admissible as an admission of a party opponent.[4]

---

[4] Section 90.803(18)(d), Florida Statutes (2019), provides a hearsay exception for "[a] statement that is offered against a party and is . . . [a] statement by the party's agent or servant concerning a matter within the scope of the agency or employment thereof, made during the existence of the relationship." Here, although Mr. Adamson was not a party to the lawsuit at the time of trial, he was the personal representative of the decedent's estate at the time he made the statement. As personal representative, Mr. Adamson was thus acting as the agent of the real party in interest (i.e., the decedent's estate and survivors), and he made the statement concerning a matter within the scope of the agency (i.e., whether he had any medical records of the decedent that he could give to the lawyers for the decedent's estate and survivors) and during the existence of the relationship.

15

The Plaintiff's reliance upon *Danielson v. Huether*, No. 4:18-CV-04039-RAL, 2021 WL 217706, at *4 (D.S.D. Jan. 21, 2021), cited as supplemental authority, is misplaced because there the court held that an adverse inference instruction was not warranted where, among other things, the statements supporting the instruction were "all hearsay" and the moving party had "*not shown that any exceptions or exclusions apply.*" (Emphasis added).

Finally, the Plaintiff's voluntary disclosure of the call log waived the attorney-client privilege. *See S & I Invs. v. Payless Flea Mkt., Inc.*, 10 So. 3d 699, 702 (Fla. 4th DCA 2009).

The trial judge did not abuse her discretion in giving the standard instruction.

*Affirmed.*

MAY and DAMOORGIAN, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

16